# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

FRED D. McMILLEN IV,

        Plaintiff,

    v.

NANCY A. BERRYHILL,
Acting Commissioner of Social Security,

        Defendant.

_____/

Case No. 1:17–cv–00664–SKO

ORDER ON PLAINTIFF'S SOCIAL
SECURITY COMPLAINT

(Doc. 1)

## I.   INTRODUCTION

On May 13, 2017, Plaintiff Fred D. McMillen IV ("Plaintiff") filed a complaint under 42 U.S.C. § 405(g) seeking judicial review of a final decision of the Commissioner of Social Security (the "Commissioner" or "Defendant") denying his application for Disability Insurance Benefits.  (Doc. 1.)  The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to the Honorable Sheila K. Oberto, United States Magistrate Judge.[1]

## II.   BACKGROUND

On October 31, 2012, Plaintiff filed an application for Disability Insurance Benefits, alleging that he became disabled on June 1, 2011, due to hypothyroidism, lumbar spine

---

[1] The parties consented to the jurisdiction of a U.S. Magistrate Judge.  (Docs. 8, 10.)

impairment, herniated disc, severe back pain, and thoracic spine impairment. (Administrative Record ("AR") 158–60, 176.) Plaintiff's date last insured was March 31, 2014. (AR 23.) Plaintiff was 42 years old on his date last insured. (*See* AR 158, listing Plaintiff's date of birth as March 22, 1972.) Plaintiff has a high school education, and previously worked as a truck driver from 1996 to 2004, a museum host from 2006 to 2008, a bus driver from 2009 to 2010, and a limo driver from March to June 2011. (AR 175, 177.)

**A.    Relevant Medical Evidence[2]**

**1.    Mountain Diagnostics**

On May 9, 2005, Plaintiff had an MRI performed of his thoracic spine at Mountain Diagnostics in Las Vegas, Nevada. (AR 888.) The results were compared to an MRI of Plaintiff's thoracic spine from November 2003 and revealed "slight dorsal spinal cord displacement at T7–8 and intermittent mild spinal cord encroachment[.]" (AR 888.)

**2.    Michelle Stacey, M.D.**

On June 3, 2010, Plaintiff presented to Dr. Stacey to follow up on previous lab tests and refill his medication. (AR 362.) Dr. Stacey's physical examination of Plaintiff was unremarkable except for mild tenderness upon palpation in the lumbar spine and decreased deep tendon reflex at the knee on the right side. (AR 363.) Dr. Stacey ordered an MRI of Plaintiff's thoracic and lumbar spine and opined that Plaintiff would benefit from pain management and a surgery evaluation. (AR 364.) Dr. Stacey also ordered an ultrasound of Plaintiff's thyroid following Plaintiff's complaints of pain and swelling on the right side of his neck. (AR 362, 364.)

On July 1, 2010, Plaintiff told Dr. Stacey his back was bothering him more than usual and he had increasing pain that radiated down his right leg. (AR 357.) When Plaintiff returned to Dr. Stacey on July 30, 2010 to review the results of his MRI, Plaintiff complained of neck problems and continued back pain. (AR 350–51.) The MRI of Plaintiff's thoracic spine revealed mild degenerative disc disease, a prominent posterior disc bulge at T8–T9 without

---

[2] As Plaintiff's assertions of error are limited to the ALJ's discrediting of the medical opinions of Michelle Stacey, M.D., Rustom Damania, M.D., and Nurse Practitioner Pamela Rico, as well as the ALJ's adverse credibility determination against Plaintiff, only evidence relevant to those arguments is set forth in this Order.

spinal stenosis or neural impingement, and no acute or subacute compression fractures. (AR 355.) The MRI of Plaintiff's lumbar spine revealed a moderate central disc bulge at L4–L5 with moderate narrowing of the lateral recess, minimal degenerative disc disease of L5–S1, an annular tear with a mild to moderate diffuse central disc bulge, and minor narrowing of the left compared with the right lateral recess. (AR 353.)

On August 27, 2010, Dr. Stacey received the results of the ultrasound on Plaintiff's thyroid, which revealed several thyroid nodules, particularly on the right side. (AR 345, 349.) Plaintiff continued to experience pain and swelling in his neck so his back surgery consultation was put on hold until after his thyroid surgery. (AR 322, 324, 326.) On November 29, 2010, Plaintiff underwent a total thyroidectomy. (AR 335–36.) Plaintiff's surgeon wrote a letter to Dr. Stacey stating that Plaintiff "did great" with the surgery and his pathology was benign. (AR 333.)

On January 20, 2011, Plaintiff continued to complain of back pain, but his back surgery consultation was delayed because he failed to provide the court in his workers' compensation case with his medical records in a timely manner. (AR 313.) Dr. Stacey noted Plaintiff had radiculopathy symptoms in his legs, but was in no acute distress. (AR 314.) Plaintiff reported that taking oxycodone instead of Percocet and Lortab was "working out well for his stomach," but he would like to increase the dosage to adequately control his pain. (AR 314.)

On February 17, 2011, Plaintiff reported that he initially felt okay after his thyroidectomy, but he was experiencing pain at the incision site, which worsened when he laid down. (AR 310–11.) Plaintiff also complained of continued back pain that radiated down to his leg. (AR 311.) Plaintiff's symptoms continued at his appointment on March 17, 2011, but he reported his pain was "fairly well controlled with his medication." (AR 307.) Dr. Stacey noted that Plaintiff had a surgery consultation pending, but was still waiting for his workers' compensation case to be processed. (AR 307.) Dr. Stacey started Plaintiff on Neurontin for his neuropathy. (AR 308.)

On April 14, 2011, Plaintiff reported the Neurontin worked "really well" at controlling his neck pain, which was almost completely resolved. (AR 304.) Dr. Stacey noted Plaintiff's condition was stable and Plaintiff had a hearing coming up in June in his workers' compensation

case, which Dr. Stacey hoped would allow Plaintiff's back surgery to move forward.  (AR 304.)  Plaintiff reported he had gone back to work, which had exacerbated his pain, but he did not want to change his pain medication.  (AR 304.)  Plaintiff continued to have pain in his lower back and legs at his appointment on May 11, 2011.  (AR 296.)

In a letter dated August 14, 2012, Dr. Stacey wrote that Plaintiff suffered from multiple medical issues including degenerative disc disease confirmed by MRI, hypothyroidism status post thyroidectomy, nephrolithiasis, gout, and hypertension.  (AR 604.)  Dr. Stacey stated that Plaintiff remained symptomatic with numbness and tingling in his bilateral lower extremities and chronic neck and back pain, despite medical therapy.  (AR 604.)  Dr. Stacey also stated Plaintiff "need[ed] further evaluation by pain management, orthopedic surgery, and further testing (potentially neurologic evaluation)."  (AR 604.)  Finally, Dr. Stacey opined that Plaintiff had been unable to work because of his chronic back problems and side effects of his opioid medications.  (AR 604.)

### 3. Physician's Assistant David Armitage

On December 22, 2010, Plaintiff presented to Dr. Stacey's physician's assistant, PA Armitage, to follow up on the results of his thyroidectomy performed during the previous month.  (AR 317.)  Plaintiff reported his pain medication was no longer as effective as it used to be and his blood pressure increased whenever he took the medication.  (AR 317.)  Upon examination, PA Armitage found Plaintiff to be alert, oriented, and in no acute distress.  (AR 317–18.)

On June 8, 2011, PA Armitage noted that when Plaintiff walked, "he held his back really straight" and he would use his arm to push himself up when he stood up out of a chair.  (AR 293.)  PA Armitage recommended Plaintiff continue wearing his back brace and increased his Neurontin prescription.  (AR 294.)  On July 5, 2011, Plaintiff reported that his back was "just killing him" and he felt like he had "a knife stuck between his shoulder blades all the time."  (AR 285.)  The oxycodone helped alleviate Plaintiff's pain, but its effectiveness wore off quickly.  (AR 285.)  Plaintiff further reported that his hands were going numb and he was losing fine motor coordination in his left hand.  (AR 285.)  Plaintiff also stated his workers' compensation case was "dragging on and on" so he would look into private insurance because

his back pain was getting worse and he wanted the surgery to fix it. (AR 285.) Upon examination, PA Armitage noted Plaintiff had +4 strength in all muscle groups of his upper extremities and a marked tremor against resistance or exertion of his left upper extremity, as well as neuropathy and radiculopathy of the upper and lower extremities. (AR 286.) PA Armitage also noted that Plaintiff had good fine and gross motor control; was able to sit, stand, and walk without difficulty; and had a normal gait. (AR 286.) PA Armitage prescribed Contin and recommended Plaintiff cut back on oxycodone. (AR 286–87.) PA Armitage also ordered another MRI of Plaintiff's thoracic and lumbar spine. (AR 287.)

On August 30, 2011, Plaintiff reported that his medications were "really, really helping" and he was doing "much, much better." (AR 274.) PA Armitage reviewed the results of Plaintiff's MRI with him. (AR 274.) According to the doctor that interpreted the images, the MRI of Plaintiff's thoracic spine was normal, but the MRI of the lumbar spine revealed desiccation of L4–L5 and L5–S1; right paracentral/neuroforaminal disc protrusion associated with an annular tear at L4–L5; questionable contact with the exiting right nerve root; and a mild, broad-based disc bulge at L5–S1 with no significant associate stenosis. (AR 274, 288–89.) PA Armitage provided a referral to orthopedic spine surgeon Dr. William Smith, M.D. (AR 275.)

On September 27, 2011, Plaintiff reported to PA Armitage that he was doing "pretty good," but that his back pain was getting worse. (AR 271.) Plaintiff was also doing "really good" on November 28, 2011, even though he recently returned from a vacation where he was not able to refill his prescription and had to drastically cut down on the medication to make it last. (AR 265.) On December 27, 2011, Plaintiff again reported he was doing "pretty good," but that his back and legs still hurt. (AR 260.) On March 22, 2012, Plaintiff stated he was having financial trouble and may need to cut back on his medication, but was going to Virginia for a couple months to visit family and would also visit the Spinal Institute to see if a doctor there could offer any assistance for his back pain. (AR 249.)

**4.    William Smith, M.D.**

On October 3, 2011, Plaintiff presented to Dr. Smith, an orthopedic surgeon, with complaints of increasing back pain for the previous seven years. (AR 239.) Dr. Smith noted

5

Plaintiff had percussion tenderness of this mid-thoracic and lower lumbar spine with flexion and extension that was 80% of normal and "quite painful." (AR 241.) Dr. Smith further noted that Plaintiff had right sciatic tenderness as well as diminished sensation in the left and right L5 dermatomes. (AR 241.) Deep tendon reflexes were normal, active, and symmetrical, and Plaintiff walked with an antalgic gait. (AR 241.) Dr. Smith opined that although Plaintiff's thoracic spine MRI was read as normal, there was a loss of discal height at T8 and T7. (AR 242.) Dr. Smith ordered a CT scan of Plaintiff's thoracic spine and x-rays of his lumbar spine, and referred him to pain management for epidural steroid injections. (AR 242.) Dr. Smith instructed Plaintiff to return after these studies were done. (AR 242.)

The CT scan of Plaintiff's thoracic spine revealed mild degenerative changes, but no significant canal narrowing, only mild canal narrowing at T7–T8, and mild to moderate foraminal narrowing at the T9–T10 level. (AR 255.) Plaintiff reported to PA Armitage that he attempted several times to make a subsequent appointment with Dr. Smith, but he was unable to get through and Dr. Smith sent him a "massive bill" that he was trying to work out. (AR 257, 260.)

### 5. Saint Agnes Medical Center

On April 23, 2013, Plaintiff presented to the Saint Agnes Medical Center emergency room complaining of neck and shoulder pain. (AR 428.) Plaintiff rated his pain as an eight on a scale of one to ten. (AR 432.) The doctor noted Plaintiff was alert, in no acute distress, and had normal range of motion and normal strength with no swelling or deformities. (AR 429.) Plaintiff's diagnosis was radicular right arm pain. (AR 429.) Plaintiff was instructed to take ibuprofen for his pain and follow up with his doctor if the pain did not go away. (AR 437.)

### 6. Rustom F. Damania, M.D.

On May 16, 2013, Dr. Damania performed an internal medicine evaluation of Plaintiff at the request of state agency. (AR 414–19.) Plaintiff reported he experienced continuous lower back pain since 2003 when he suffered an injury at work. (AR 414.) According to Plaintiff, the pain radiated to his left leg and was associated with paresthesias, numbness, and weakness. (AR 414.) The pain in his thoracic spine radiated to both shoulders, upper back, and into both arms

with paresthesias. (AR 414.) Plaintiff stated he had used a cane since 2011 because he was unable to stand up from a seated position due to pain and weakness in his left leg. (AR 414.) Plaintiff also stated he did not have workers' compensation or medical insurance and had not been to a doctor for a follow up appointment since May 2012. (AR 414.)

Upon physical examination, Dr. Damania observed Plaintiff's neck and upper and lower extremities to have full range of motion within normal limits. (AR 416–17.) Dr. Damania's examination also revealed tenderness at the T7–T8 level, but no signs of radiculopathy in the upper extremities; positive straight leg raise test on the left at 45 degrees in the sitting position; and reduced forward flexion, extension, and lateral flexion in Plaintiff's back. (AR 416–17.) Plaintiff's muscle strength in the right lower extremity was 5/5 and 4/5 in the left lower extremity with no obvious wasting. (AR 418.) Plaintiff had sensory impairment in the L4–L5 distribution of the left lower leg and normal deep tendon reflexes. (AR 418.)

After examining Plaintiff and reviewing the available medical records, Dr. Damania opined Plaintiff could lift and carry twenty pounds occasionally and ten pounds frequently, stand and walk four hours out of an eight-hour workday, and sit two to four hours out of an eight-hour workday. (AR 419.) Dr. Damania further opined that Plaintiff did not need an assistive device for ambulation even though Plaintiff subjectively stated he needed a cane because of left lower extremity weakness. (AR 419.) Dr. Damania limited Plaintiff to occasional bending, stooping, crouching, crawling, or kneeling, and no climbing or balancing. (AR 419.) Dr. Damania identified no manipulative impairments and no relevant visual or communicative impairments. (AR 419.)

### 7.    Nurse Practitioner Helen Monnens

On November 5, 2013, NP Helen Monnens at the Community Rural Health Clinic in Oakhurst, California, ordered x-rays of Plaintiff's cervical spine and thoracic spine because Plaintiff was experiencing pain in his bilateral mandibles and numbness in his hands. (AR 448, 461.) According to the doctor reading the images, the x-rays of Plaintiff's cervical spine revealed mild degenerative changes of the cervical spine with neural foraminal narrowing and straightening of the normal cervical lordosis that might have been due to Plaintiff's positioning

and/or muscle spasm.  (AR 449, 459.)  The x-rays of the thoracic spine revealed mild degenerative changes and a suggestion of diffuse osseus demineralization.  (AR 450, 460.)

MRIs of Plaintiff's cervical spine and thoracic spine were also performed on December 11, 2013.  (AR 452–58.)  According to the doctor reading the images, the MRI of Plaintiff's cervical spine revealed degenerative changes in the cervical spine; mild reversal of the normal cervical lordosis at C4–C5; a two-millimeter left paracentral disc osteophyte complex at C4–C5, which mildly indented the left ventral surface of the spinal cord; a two-millimeter central protrusion with associated annular fissuring at the C5–C6 level, which caused a mild impression on the ventral surface of the spinal cord; and a one-millimeter central protrusion with associated annular fissuring, which indented the thecal sac at the C6–C7 level.  (AR 453.)  The MRI of Plaintiff's thoracic spine revealed mild chronic wedging of the T6 vertebral body with approximately 15% loss of height, with the rest of the rest of the heights preserved; a normal thoracic spinal cord; and a small central protrusion with associated annular fissuring, which indented the thecal sac, but did not contact the spinal cord.  (AR 455–56.)  No spinal canal stenosis, neural foraminal narrowing, or abnormal signal in the ligaments or paraspinal muscles, were noted.  (AR 455–56.)

NP Monnens' treatment notes from December 19, 2013 state she was referring Plaintiff to a neurosurgeon.  (AR 457.)

**8.      Nurse Practitioner Pamela Rico**

On February 13, 2014, Plaintiff presented to NP Pamela Rico at Primary Care Consultants in Oakhurst, California, to establish care.  (AR 613.)  According to Plaintiff, he established care at Primary Care Consultants because his previous provider "dropped the ball" and he was waiting for a referral to a neurosurgeon that was never provided.  (AR 613.)  Plaintiff reported he had "weaned himself off all meds," but did have a bottle of Norco from his previous provider that he was trying to stretch as long as possible.  (AR 613.)  Plaintiff also reported he was angry that he was not getting the disability benefits to which he felt entitled and had not attended physical therapy recently because he could not afford to travel to Oakhurst one to two times a week.  (AR 613.)

Plaintiff complained of muscle cramps, joint pain, back pain, muscle weakness, and loss of strength. (AR 617.) On physical examination, NP Rico observed Plaintiff to be in no acute distress and have normal, full range of motion in all joints, with weakness to upper extremity grips. (AR 617.) NP Rico noted Plaintiff had a steady gait and changed position with ease, but had spasms in his cervical spine and upper shoulder area. (AR 617.) NP Rico prescribed Norco and Synthroid, ordered several additional tests, and referred Plaintiff for a physical therapy consultation. (AR 620.) Plaintiff's treatment notes from his February 13, 2014 appointment were electronically signed by both NP Rico and Dr. Kathleen Baron, M.D. (AR 621.)

Plaintiff returned to NP Rico on March 4, 2014 to follow up on his test results. (AR 642.) NP Rico reviewed Plaintiff's previous MRIs and explained to Plaintiff that his MRI results were not severe enough to warrant surgery at that time. (AR 642.) NP Rico encouraged Plaintiff to participate in physical therapy because if he did not show improvement, it would help show the neurologist that he had tried everything before surgery. (AR 642.) Plaintiff refused to try physical therapy because he said he could not afford to travel to Oakhurst twice a week; NP Rico reminded Plaintiff of a service that would provide free transportation to his appointments. (AR 642.)

NP Rico's treatment notes, co-signed by Dr. Baron, for Plaintiff's appointments on April 10, May 2, May 28, July 1, July 22, and September 12, 2014, indicate his condition generally remained unchanged. (AR 657, 663, 673–74, 680, 686, 854.) Specifically, Plaintiff continued to be in no acute distress, walk with a steady gait, change positions with ease, and have normal range of motion in his extremities with weakness in his upper extremity grips and spasms in his cervical spine and upper shoulder area. (AR 656, 662, 672–73, 679, 685, 853.)

An MRI of Plaintiff's lumbar spine was performed on August 13, 2014. (AR 840.) According to the doctor reading the MRI results, the MRI revealed degenerative changes in the lumbar spine, a three-millimeter central protrusion with associated annular fissuring at the L5–S1 level, and a two-millimeter right paracentral protrusion with associated annular fissuring at the L4–L5 level. (AR 840.) Plaintiff also had MRIs taken of his cervical spine and thoracic spine on September 4, 2014. (AR 844–49.) According to the doctor interpreting the images, the

cervical spine revealed unchanged findings from the earlier MRI on December 11, 2013. (AR 844.) The MRI of the thoracic spine revealed degenerative changes similar to the MRI in December 2013, as well as fissuring of the posterior portion of the annulus at the T5–T6 level and a one-millimeter central protrusion with associated annular fissuring at the T7–T8 level. (AR 848.) The reviewing doctor also noted mild chronic anterior wedging of the T6 vertebral body, with approximately 15% loss of height, which was unchanged compared to the prior MRI in December 2013. (AR 848.)

On September 14, 2014, NP Rico completed a Disability Impairment Questionnaire for Plaintiff. (AR 499–503.) NP Rico diagnosed Plaintiff with neck pain, thoracic pain, lumbar back pain, herniated discs (cervical and lumbar), and nerve root and plexus disorder. (AR 499.) As support for her diagnosis, NP Rico generally cited "multiple images" without specifying any particular images and stated Plaintiff had "seen specialists" and had a pending surgery. (AR 499.) NP Rico opined that Plaintiff could perform a job in a seated position for less than one hour in an eight-hour workday and needed to get up from a seated position every thirty minutes for five to ten minutes. (AR 501.) NP Rico also opined that Plaintiff could perform a job in a standing and/or walking position for less than one hour in an eight-hour day, and had significant limitations in reaching, handling, or fingering. (AR 501–02.) According to NP Rico, Plaintiff could occasionally lift and carry up to ten pounds, but could never lift or carry more than ten pounds. (AR 501.) NP Rico concluded Plaintiff would need several unscheduled breaks of ten to fifteen minutes, and on average, would likely be absent more than three times per month due to his impairments. (AR 502–03.) NP Rico opined Plaintiff's limitations and symptoms applied as far back as March 1, 2010. (AR 503.) According to Plaintiff, both NP Rico and Dr. Baron signed the opinion, but the purported signature of Dr. Baron is illegible. (AR 70, 503; *see also* Doc. 17 at 24.)

### 9. William J. Jawien, M.D.

On April 4, 2014, Plaintiff saw Dr. Jawien for a hematology/oncology consultation. (AR 473.) Dr. Jawien's examination of Plaintiff's back and spine revealed no kyphosis, scoliosis, compression fractures, or tenderness. (AR 474.) Plaintiff had a normal gait and normal range of

motion with no obvious weakness.  (AR 474–75.)  Dr. Jawien assessed Plaintiff with leukocytosis, chronic neck and back pain, and questionable hepatomegaly with increased hepatic echogenicity.  (AR 475.)  On May 6, 2014, Plaintiff returned to Dr. Jawien for a follow up appointment and Plaintiff's physical examination remained unremarkable.  (AR 478.)

**10.    Rohini J. Joshi, M.D.**

On April 30, 2014, Plaintiff presented to neurologist Dr. Joshi complaining of numbness and tingling in his limbs and ringing in his ears.  (AR 468.)  Upon physical examination, Dr. Joshi found Plaintiff to have normal muscle tone and strength in his upper and lower extremities, with normal bilateral sensation and reflexes.  (AR 469–70.)  Dr. Joshi noted Plaintiff's coordination and gait were normal.  (AR 470.)  Dr. Joshi diagnosed Plaintiff with cervical spondylosis and referred Plaintiff for pain management and neurological surgery.  (AR 470.)

Dr. Joshi ordered a neurologic evaluation of Plaintiff, which was performed by Dr. Boota Cahil, M.D. on July 28, 2014.  (AR 472.)  Dr. Cahil found that motor and sensory nerve conduction studies of the right and left median and ulnar nerves were normal.  (AR 472.)  There was no evidence of compression neuropathy, polyneuropathy, or ongoing cervical radioculopathy.  (AR 472.)

Dr. Joshi's examination on August 21, 2014 yielded similar findings to Plaintiff's April appointment.  (AR 466–67.)  On October 1, 2014, Dr. Joshi noted Plaintiff had restricted range of motion of the proximal upper extremity with positional pain in the neck.  (AR 462.)  Dr. Joshi's examination of Plaintiff yielded otherwise unremarkable results with Plaintiff showing normal muscle tone and strength, reflex, coordination, and gait.  (AR 464.)

**11.    State Agency Physicians**

On June 10, 2013, W. Jackson, M.D., a Disability Determination Services medical consultant, reviewed the medical evidence of record and concluded Plaintiff could lift and carry twenty pounds occasionally and ten pounds frequently; stand and walk four hours in an eight-hour day with normal breaks; sit six hours in an eight-hour day with normal breaks; and perform postural activities occasionally.  (AR 81–82.)  Dr. Jackson identified no manipulative, visual, communicative, or environmental limitations.  (AR 82.)  Upon reconsideration, on March 8,

2014, another Disability Determination Services medical consultant, Lisa Mani, M.D., performed an independent review of Plaintiff's medical records and affirmed Dr. Jackson's opinion.  (AR 94–95.)

**B.    Administrative Proceedings**

The Commissioner denied Plaintiff's application for Disability Insurance Benefits initially on June 13, 2013, and again on reconsideration on March 10, 2014.  (AR 101–05, 107–11.)  Consequently, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  (AR 113–19.)   At the hearing on October 15, 2015, Plaintiff appeared with a non-attorney representative and testified before an ALJ as to his alleged disabling conditions.  (AR 21; *see generally* AR 43–73.)

**1.    Plaintiff's Testimony**

Plaintiff testified that he suffers from disabling neck and back pain, but his neck is the more significant issue.  (AR 48.)  Plaintiff testified that his neck pain began around January 2013 and caused him to lose control of his fine motor skills.  (AR 48.)  According to Plaintiff, he experiences a burning sensation that radiates from his jaw, down to his shoulders, arms, hands, chest, and rib area and a stabbing sensation in his jaw after he eats.  (AR 48–49.)  Plaintiff takes several medications, which help alleviate the pain.  (AR 49.)  Plaintiff also participates in pain management therapy and uses a TENS unit, which helps with the inflammation.  (AR 49.)  Plaintiff also testified he was undergoing surgery on his neck one week after testifying at the hearing in October 2015.  (AR 50–51.)   The neck surgery took over two years to schedule because Plaintiff does not have medical insurance.  (AR 59.)

With regard to his back pain, Plaintiff testified that it started when he fell at work in 2004.  (AR 51.)  Plaintiff stated that he feels like there is "a knife or something stuck in the middle of my back all the time" and the pain radiates around his ribs to his sternum/chest area.  (AR 52.)  The pain also radiates down his legs such that he experiences numbness and a burning sensation in his legs, especially in his thighs, which is worse in his left leg.  (AR 61.)  However, Plaintiff also testified the burning sensation has "been temporarily stuck to my shoulders and arms, but not my legs" and "it's just been numbness and sometimes shooting pain down my legs."  (AR

62.)  He experiences pain every day that fluctuates depending on what he is doing.  (AR 52.)  According to Plaintiff, standing and stooping make the pain worse, but he can alleviate the pain by "lean[ing] up against the wall with the flat of [his] back and lock[ing] [his] legs."  (AR 52–53.)  Despite experiencing continuous pain for eleven years, Plaintiff has not had any surgeries performed on his back and is not receiving any treatment for his back.  (AR 53.)  Plaintiff explained that he is waiting to complete the neck surgery before addressing his back and delayed the back surgery "until technology caught up" because he felt the back surgery was too invasive for the problems he was experiencing at the time.  (AR 53.)

Plaintiff testified that, as a result of his neck and back pain, he can sit for a couple hours before he needs to get up and move around for five to ten minutes.  (AR 54–55.)  He can stand for around a half hour without sitting before he needs to sit for ten to fifteen minutes.  (AR 54–55.)  He can walk a quarter mile at a time and lift five to ten pounds.  (AR 55.)  He does not experience any side effects from his medication, other than his blood pressure medication, which sometimes makes him drowsy.  (AR 57.)  He was uncertain whether he could go back to work at a job that involved mostly sitting, some standing or walking, and light lifting.  (AR 59.)

On a typical day, Plaintiff wakes up and helps his wife get ready for work.  (AR 56.)  He is capable of independently handling his daily personal care including dressing, bathing, grooming, and toileting.  (AR 57.)  He takes care of the animals at his house, which include three dogs and a chicken, and helps with laundry and cooking.  (AR 56.)  When he cooks, he has trouble chopping and using a knife, but he can prepare quick and simple meals.  (AR 61.)  He does some cleaning, but no vacuuming, and he does not clean the dishes because he has broken too many dishes due to his deteriorating fine motor skills.  (AR 56.)  Plaintiff testified that he does not go shopping and has not driven for the past few months because his doctors advised that he not drive until he gets surgery on his neck.  (AR 47, 57.)  When he leaves the house, Plaintiff generally goes to visit with his in-laws who live less than a half mile away.  (AR 57.)

Plaintiff testified he is capable of using a computer including typing and manipulating the mouse, but does not have a computer because he cannot afford one.  (AR 57–58, 60.)  He has difficulty with writing and pushing buttons, and cannot raise his arms above his shoulders.  (AR

13

60–61.)  His legs give out on him a couple times a month, usually after getting up from sitting down for extended periods.  (AR 62.)  If he lays down flat, his arms and shoulders go completely numb, so the most comfortable position is lying down with his upper body and legs elevated.  (AR 62–63.)  According to Plaintiff, he sleeps four hours total each night, which is interrupted every hour for him to move, and takes a nap for up to an hour in the afternoon.  (AR 63.)

### 2.    Vocational Expert's Testimony

A Vocational Expert ("VE") testified at the hearing that Plaintiff has past work experience as (1) a chauffeur, Dictionary of Operational Titles ("DOT") code 359.673-010, which was semiskilled, light work, with a specific vocational preparation ("SVP") of 3; (2) bus driver, DOT code 913.463-010, which was semiskilled, medium work, with an SVP of 4; (3) sightseeing guide, DOT code 353.363-010, which was semiskilled, light work, with an SVP of 4; and (4) truck driver, DOT 904.383-010, which was semiskilled, medium work, with an SVP of 4.  (AR 66–67.)

The ALJ then asked the VE three hypothetical questions.  First, the ALJ asked the VE to consider a person with Plaintiff's past work experience and vocational factors, who is limited to sedentary work with no more than occasionally climbing ramps and stairs, balancing, stooping, kneeling, crouching, crawling, and exposure to moving mechanical parts, but never climbing ropes, ladders, or scaffolds.  (AR 67.)  The ALJ then asked the VE whether, given this, such a person could perform any of Plaintiff's past work.  (AR 67.)  The VE testified that such a person could not perform any of Plaintiff's past relevant work.  (AR 67–68.)  However, he could perform the following unskilled, sedentary jobs: (1) ticket counter worker, DOT code 219.587-010, SVP of 2, for which there exists approximately 74,000 jobs in the national economy, and (2) charge account clerk, DOT code 205.367-014, SVP of 2, for which there exists approximately 35,000 jobs in the national economy.  (AR 68.)

The ALJ then asked the VE a second hypothetical question considering the same person with the same capabilities as outlined in the first hypothetical, but who is limited to frequent bilateral handling, fingering, and feeling.  (AR 68.)  The VE testified that such a person could perform the positions outlined in response to the first hypothetical question.  (AR 68.)

The ALJ asked the VE a third hypothetical question considering the same person as outlined in the first hypothetical, but who is limited to occasional bilateral handling, fingering, and feeling. (AR 69.) The VE testified that such a person could not perform the positions outlined in response to the first hypothetical question. (AR 69.)

## C. The ALJ's Decision

In a decision dated January 25, 2016, the ALJ found that Plaintiff was not disabled. (AR 21–32.) The ALJ conducted the five-step disability analysis set forth in 20 C.F.R. § 404.1520. (AR 22–23.) First, the ALJ found that Plaintiff's had not engaged in substantial gainful activity from the alleged onset date, June 1, 2011, through his date last insured of March 31, 2014. (AR 23.) At Step Two, the ALJ found that Plaintiff had the severe impairments of thoracic, cervical, and lumbar degenerative disc disease, and hypothyroidism. (AR 23.) However, at Step Three, the ALJ found Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings"). (AR 23–24.) The ALJ determined that Plaintiff had the residual functional capacity ("RFC")[3]

> to perform sedentary work as defined in 20 CFR 404.1567(a) except lift and carry 20 pounds occasionally and frequently 10. Sit, stand and walk for 6 hours out of an 8-hour workday. He can occasionally climb ramps, and stairs, balance, stoop, kneel, crouch and crawl. He cannot climb ropes, ladders or scaffolds, or work at unprotected heights. He can occasionally [sic] work around moving mechanical parts.

(AR 16.) Of particular relevance to the claims asserted by Plaintiff in the instant action, the ALJ discounted Dr. Stacey's opinion regarding Plaintiff's RFC because it "is contrary to the rather mild objective findings noted in Dr. Stacey's progress notes" and "there is no mention of significant medication side effects rather that they have worked well in controlling his complaints of pain."

---

[3] RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis of eight hours a day, for five days a week, or an equivalent work schedule. Social Security Ruling 96-8p. The RFC assessment considers only functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments. *Id.* "In determining a claimant's RFC, an ALJ must consider all relevant evidence in the record including, *inter alia*, medical records, lay evidence, and 'the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment.'" *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006).

(AR 28.)  The ALJ also discounted the opinion of NP Rico because, as a nurse practitioner, she was not an acceptable medical source under the Social Security regulations and NP Rico's "objective findings during physical examinations are not supportive of her opinion."  The ALJ gave "significant weight" to the opinion of consultative examiner Dr. Damania and "great weight" to the opinions of state agency medical consultants Dr. Jackson and Dr. Mani because these opinions were consistent with the overall medical record.  (AR 29.)  Finally, the ALJ found Plaintiff's statements concerning his symptoms "not entirely credible" because his testimony was inconsistent with his daily activities and objective medical evidence in the record, and Plaintiff was able to effectively manage his symptoms through conservative medical treatment without hospitalization or surgery and work for several years after the accident that caused his back pain. (AR 29–30.)  The ALJ determined that, given his RFC, Plaintiff was unable to perform any past relevant work (Step Four), but that Plaintiff was not disabled because he could perform a significant number of other jobs in the local and national economies, specifically ticket counter worker and charge account clerk (Step Five).

Plaintiff sought review of this decision before the Appeals Council, which denied review on March 9, 2017.  (AR 1–6.)  Therefore, the ALJ's decision became the final decision of the Commissioner.  20 C.F.R. § 404.981.  Plaintiff filed a complaint before this Court on May 13, 2017 seeking review of the ALJ's decision.  (Doc. 1.)

### III.  SCOPE OF REVIEW

The ALJ's decision denying benefits "will be disturbed only if that decision is not supported by substantial evidence or it is based upon legal error." *Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir. 1999).  In reviewing the Commissioner's decision, the Court may not substitute its judgment for that of the Commissioner.  *Macri v. Chater*, 93 F.3d 540, 543 (9th Cir. 1996).  Instead, the Court must determine whether the Commissioner applied the proper legal standards and whether substantial evidence exists in the record to support the Commissioner's findings.  *See Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting

*Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)). "Substantial evidence is more than a mere scintilla but less than a preponderance." *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008). The Court "must consider the entire record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion, and may not affirm simply by isolating a specific quantum of supporting evidence." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007) (citation and internal quotation marks omitted).

## IV. APPLICABLE LAW

An individual is considered disabled for purposes of disability benefits if he or she is unable to engage in any substantial, gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted, or can be expected to last, for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A); *see also Barnhart v. Thomas*, 540 U.S. 20, 23 (2003). The impairment or impairments must result from anatomical, physiological, or psychological abnormalities that are demonstrable by medically accepted clinical and laboratory diagnostic techniques and must be of such severity that the claimant is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial, gainful work that exists in the national economy. 42 U.S.C. § 423(d)(2)–(3).

The regulations provide that the ALJ must undertake a specific five-step sequential analysis in the process of evaluating a disability. In the First Step, the ALJ must determine whether the claimant is currently engaged in substantial gainful activity. 20 C.F.R. § 404.1520(b). If not, in the Second Step, the ALJ must determine whether the claimant has a severe impairment or a combination of impairments significantly limiting him from performing basic work activities. *Id.* § 404.1520(c). If so, in the Third Step, the ALJ must determine whether the claimant has a severe impairment or combination of impairments that meets or equals the requirements of the Listing of Impairments ("Listing"), 20 C.F.R. 404, Subpart P, App. 1. *Id.* § 404.1520(d). If not, in the Fourth Step, the ALJ must determine whether the claimant has sufficient residual functional capacity despite the impairment or various limitations to perform his past work. *Id.* § 404.1520(f). If not, in Step Five, the burden shifts to the Commissioner to show that the claimant can perform other

work that exists in significant numbers in the national economy. *Id*. § 404.1520(g). If a claimant is found to be disabled or not disabled at any step in the sequence, there is no need to consider subsequent steps. *Tackett v. Apfel*, 180 F.3d 1094, 1098–99 (9th Cir. 1999); 20 C.F.R. § 404.1520.

## V. DISCUSSION

In his Opening Brief, Plaintiff contends the ALJ erred in four respects: (1) the ALJ failed to articulate sufficient reasons for discrediting Dr. Stacey's medical opinion; (2) the ALJ's RFC finding does not adequately reflect the opinion of Dr. Damania, to whom the ALJ gave significant weight; (3) the ALJ erroneously discredited the opinion of NP Rico; and (4) the ALJ failed to articulate clear and convincing reasons for discrediting Plaintiff's subjective complaints. (*See generally* Doc. 17 at 14–28.) Defendant responds that the ALJ properly weighed the conflicting evidence and medical opinions regarding Plaintiff's physical limitations and provided sufficient reasons for discrediting Plaintiff's subjective complaints. (Doc. 26 at 14–30.)

### A. The ALJ's Consideration of the Medical Opinions

#### 1. Legal Standard

The ALJ must consider and evaluate every medical opinion of record. *See* 20 C.F.R. § 404.1527(b) and (c) (applying to claims filed before March 27, 2017); *Mora v. Berryhill*, No. 1:16–cv–01279–SKO, 2018 WL 636923, at *10 (E.D. Cal. Jan. 31, 2018). In doing so, the ALJ "cannot reject [medical] evidence for no reason or the wrong reason." *Mora*, 2018 WL 636923, at *10.

Cases in this circuit distinguish between three types of medical opinions: (1) those given by a physician who treated the claimant (treating physician); (2) those given by a physician who examined but did not treat the claimant (examining physicians); and (3) those given by a physician who neither examined nor treated the claimant (non-examining physicians). *Fatheree v. Colvin*, No. 1:13–cv–01577–SKO, 2015 WL 1201669, at *13 (E.D. Cal. Mar. 16, 2015). "Generally, a treating physician's opinion carries more weight than an examining physician's, and an examining physician's opinion carries more weight than a reviewing physician's." *Holohan v. Massanari*, 246 F.3d 1195, 1202 (9th Cir. 2001) (citations omitted); *see also Orn v. Astrue*, 495 F.3d 625, 631 (9th Cir. 2007) ("By rule, the Social Security Administration favors

18

the opinion of a treating physician over non-treating physicians." (citing 20 C.F.R. § 404.1527)). The opinions of treating physicians "are given greater weight than the opinions of other physicians" because "treating physicians are employed to cure and thus have a greater opportunity to know and observe the patient as an individual." *Smolen v. Chater*, 80 F.3d 1273, 1285 (9th Cir. 1996) (citations omitted).

To evaluate whether an ALJ properly rejected a medical opinion, in addition to considering its source, the court considers whether (1) contradictory opinions are in the record; and (2) clinical findings support the opinions. An ALJ may reject an uncontradicted opinion of a treating or examining medical professional only for "clear and convincing" reasons. *Lester v. Chater*, 81 F.3d 821, 830–31 (9th Cir. 1995). In contrast, a contradicted opinion of a treating or examining professional may be rejected for "specific and legitimate reasons that are supported by substantial evidence." *Trevizo v. Berryhill*, 871 F.3d 664, 675 (9th Cir. 2017) (citing *Ryan*, 528 F.3d at 1198); *see also Lester*, 81 F.3d at 830–31. "The ALJ can meet this burden by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Trevizo*, 871 F.3d at 675 (citing *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989)). While a treating professional's opinion generally is accorded superior weight, if it is contradicted by a supported examining professional's opinion (supported by different independent clinical findings), the ALJ may resolve the conflict. *Andrews v. Shalala*, 53 F.3d 1035, 1041 (9th Cir. 1995) (citing *Magallanes*, 881 F.2d at 751). The regulations require the ALJ to weigh the contradicted treating physician opinion, *Edlund v. Massanari*, 253 F.3d 1152, 1157 (9th Cir. 2001),[4] except that the ALJ in any event need not give it any weight if it is conclusory and supported by minimal clinical findings. *Meanel v. Apfel*, 172 F.3d 1111, 1114 (9th Cir. 1999) (treating physician's conclusory, minimally supported opinion rejected); *see also Magallanes*, 881 F.2d at 751. The opinion of a non-examining professional, by itself, is insufficient to reject the opinion of a treating or examining professional. *Lester*, 81 F.3d at 831.

---

[4] The factors include: (1) length of the treatment relationship; (2) frequency of examination; (3) nature and extent of the treatment relationship; (4) supportability of diagnosis; (5) consistency; and (6) specialization. 20 C.F.R. § 404.1527.

## 2. The ALJ Stated Sufficient Reasons for Rejecting Dr. Stacey's Opinion.

Dr. Stacey was Plaintiff's primary care physician and drafted a letter in August 2012 opining that Plaintiff was unable to work due to pain and side effects of his medications. (AR 604.) Dr. Stacey's letter stated that as of August 2012, Plaintiff remained symptomatic with numbness and tingling in his bilateral lower extremities and chronic neck and back pain, despite medical therapy. (AR 604.) Dr. Stacey further opined that Plaintiff needed further evaluation for pain management and orthopedic surgery as well as other testing. (AR 604.)

In rejecting Dr. Stacey's opinion, the ALJ stated:

> No significant weight can be accorded [Dr. Stacey's] opinion as it is contrary to the rather mild objective findings noted in Dr. Stacey's progress notes. In addition, there is no mention of significant medication side effects rather that they have worked well in controlling his complaints of pain and he did not abuse them.

(AR 28.) An ALJ may properly discount a treating physician's opinion that is inconsistent with the physician's treatment notes. *Connett v. Barnhart*, 340 F.3d 871, 875 (9th Cir. 2003) ("We hold that the ALJ properly found that Dr. Magsarili's extensive conclusions regarding Connett's limitations are not supported by his own treatment notes."); *see also Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001) (finding that the ALJ properly rejected the opinion of a treating physician since it was not supported by treatment notes or objective medical findings). Although not specifically identified by the ALJ as a basis for its rejection, Dr. Stacey's opinion is contradicted by the medical opinion evidence of consultative examiner Dr. Damania and Disability Determination Services non-examining consultants Drs. Jackson and Mani. These three physicians all agreed that Plaintiff could (1) lift and carry twenty pounds occasionally and ten pounds frequently; (2) stand and/or walk four hours in an eight-hour day; and (3) occasionally climb, stoop, kneel, crouch, and crawl. (AR 81–82, 94–95, 419.) Thus, the ALJ was required to state "specific and legitimate" reasons, supported by substantial evidence, for rejecting Dr. Stacey's opinion. *Trevizo*, 871 F.3d at 675 (citing *Ryan*, 528 F.3d at 1198); *see also Lester*, 81 F.3d at 830.

Here, the ALJ noted that Dr. Stacey's opinion was contrary to her "rather mild objective findings" in her treatment notes. For example, although Dr. Stacey concluded Plaintiff was unable

to work in any capacity at all, the ALJ noted Dr. Stacey performed an essentially normal physical examination of Plaintiff.  (AR 27 (citing AR 363).)  The ALJ also cited by exhibit and page number in the record to Dr. Stacey's treatment notes in which Plaintiff reported subjective complaints of back pain and radiculopathy symptoms in his legs, but upon physical examination Dr. Stacey observed Plaintiff was in no acute distress.  (AR 27 (citing AR 313–14).)  The ALJ also cited to Dr. Stacey's treatment notes from April 2011—one of Plaintiff's final appointments with Dr. Stacey—in which Dr. Stacey noted that Plaintiff's condition was stable and she again found Plaintiff to be in no acute distress.  (AR 27–28 (citing AR 304–05).)  Such sharp contradictions between Dr. Stacey's treatment notes and her opinion letter constitute "specific and legitimate" reasons for rejecting Dr. Stacey's opinion.

Additionally, while Dr. Stacey opined Plaintiff could not work at all due to side effects from his medication, the ALJ found there was no evidence in the record of significant side effects from Plaintiff's medication.  In response, Plaintiff directs the Court to portions of the record in which Plaintiff's doctors counseled Plaintiff about *potential* side effects of his medication and one instance in which Plaintiff reported that when he takes his pain medication, "his blood pressure seems to go up."  (Doc. 17 at 17 (citing AR 286–87, 317, 364).)  Although Plaintiff bears the burden of demonstrating the ALJ erred, he has failed to satisfy his burden of pointing to any evidence in the record that Plaintiff experienced debilitating side effects from his medication.  *Miller v. Heckler*, 770 F.2d 845, 849 (9th Cir. 1985) (upholding an ALJ's decision where the claimant had the burden of producing evidence that his use of prescription narcotics impaired his ability to work, but failed to do so); *see also Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012) ("[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination." (alterations in original) (quoting *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009))).  As Plaintiff failed to satisfy his burden of identifying evidence in the record showing the ALJ erred, the Court finds the ALJ's decision is supported by substantial evidence and will not find the ALJ erred.  *See Flaten v. Sec'y of Health & Human Servs.*, 44 F.3d 1453, 1457 (9th Cir. 1995) ("[W]e may set aside a denial of benefits only if it is not supported by substantial evidence or if it is based on legal error.").

The ALJ next found that Dr. Stacey's treatment notes demonstrated that Plaintiff's medication "worked well in controlling his complaints of pain." (AR 28.) In support of this finding, the ALJ cited to Dr. Stacey's treatment notes stating that Plaintiff reported his pain was "fairly well controlled with his medication" in March 2011 and his medication "worked really well for his neck pain" in April 2011. (AR 27–28 (citing AR 304, 307).) Although Plaintiff responds by pointing to the treatment notes of PA Armitage and contending that PA Armitage's notes are inconsistent with the portions of Dr. Stacey's treatment notes identified by the ALJ (Doc. 17 at 16–17 (citing AR 260, 271, 274, 277)), the ALJ properly pointed to evidence in the record that supported his findings. (AR 27–28 (citing AR 304 (pain "fairly well controlled with his medication"), 307 (medication "worked really well for his neck pain").) As the ALJ is responsible for resolving such conflicts in the medical record, the Court finds that the ALJ provided specific, legitimate reasons supported by substantial evidence for discounting Dr. Stacey's opinion that Plaintiff was unable to work, and this Court will not disturb the ALJ's decision. *Tidwell*, 161 F.3d at 601 ("The ALJ's decision denying benefits will be disturbed only if that decision is not supported by substantial evidence or it is based upon legal error."); *Andrews*, 53 F.3d at 1039 ("The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities.").

### 3. The ALJ Erroneously Disregarded Portions of Dr. Damania's Opinion.

The ALJ purportedly accorded "significant weight" to the opinion of consultative examining physician Dr. Damania. (AR 29.) However, the ALJ erred by failing to consider all the limitations imposed by Dr. Damania.

The ALJ found that Plaintiff had the RFC to "[s]it, stand and walk for 6 hours of an 8-hour workday." (AR 24.) However, Dr. Damania opined that Plaintiff could only stand and walk for four hours in the eight-hour day, and sit for two to four hours in an eight-hour day. (AR 419.) Thus, the ALJ's RFC assessment was inconsistent with the opinion of Dr. Damania, to which the ALJ gave significant weight.

Because the ALJ did not accept that portion of Dr. Damania's opinion, the ALJ was required to provide specific and legitimate reasons for rejecting it supported by substantial evidence, if the

opinion conflicted with other medical opinions in the record. *Trevizo*, 871 F.3d at 675 (citing *Ryan*, 528 F.3d at 1198); *see also Lester*, 81 F.3d at 830. Here, Dr. Damania's opinion conflicted with the opinions of state agency physicians Drs. Jackson and Mani, who both concluded Plaintiff could sit six hours in an eight-hour day. (AR 82, 94.) However, the ALJ did not give any reasons for rejecting any of Dr. Damania's opinion, and on the contrary, it appears from the ALJ's decision that he was accepting Dr. Damania's opinion *in toto*. (AR 28–29 (explaining Dr. Damania's opinion and stating the opinion is given significant weight with no indication that the RFC would not reflect Dr. Damania's opinion in its entirety).) Additionally, even though the ALJ discusses the opinions of Drs. Jackson and Mani, concluding Plaintiff could sit for six hours a day, the opinions of Drs. Jackson and Mani alone do not constitute substantial evidence for rejecting Dr. Damania's opinion because Drs. Jackson and Mani are non-examining physicians. *Lester*, 81 F.3d at 831 ("The opinion of a nonexamining physician cannot by itself constitute substantial evidence that justifies the rejection of the opinion of either an examining physician or a treating physician."). Accordingly, the ALJ erred by failing to point to specific and legitimate reasons for rejecting Dr. Damania's opinion that Plaintiff was limited to sitting for only two to four hours a day.

Defendant contends the ALJ's error is harmless because the ALJ's RFC assessment is supported by other substantial evidence in the record. (Doc. 26 at 19.) Specifically, Defendant points to examples in the record when Plaintiff sat with a normal posture, changed positions with ease, and consistently walked with a normal gait. (Doc. 26 at 19 (citing AR 400–01, 613–18).) However, the question is not whether evidence in the record exists to support the ALJ's finding, but whether the ALJ articulated sufficient reasons for discrediting Dr. Damania's opinion. *Arruda v. Colvin*, No. 2:12–cv–2701–AC, 2013 WL 6860293, at *8 (E.D. Cal. Dec. 30, 2013) ("While there are numerous permissible reasons for an ALJ to discount the weight given to the opinion of an examining and/or consulting physician, the ALJ must actually state those reasons and provide factual support from the record that constitutes substantial evidence."); *see also Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1225–26 ("Long-standing principles of administrative law require us to review the ALJ's decision based on the reasoning and factual findings offered by the

ALJ—not post hoc rationalizations that attempt to intuit what the adjudicator may have been thinking."). Here, the ALJ did not point to any reason, much less a specific and legitimate one, for rejecting Dr. Damania's opinion that Plaintiff could sit for only two to four hours. Thus, Defendant's argument fails because even if the evidence Defendant identifies could support a finding that Plaintiff is capable of sitting for six hours, the Court has no discussion of the medical evidence from the ALJ to analyze and the Court is not authorized to assess the medical evidence in the first instance. *Ortiz v. Astrue*, No. 1:11–cv–00064–SKO, 2012 WL 639508, at *11 (E.D. Cal. Feb. 24, 2012) ("While the Court may make reasonable inferences regarding the rationale offered by the ALJ . . . , the absence of a discussion of the medical evidence requires the Court to make findings about the weight of the medical evidence in the first instance or otherwise intuit how the ALJ reached his conclusions and affirm the decision based on rationale not provided— tasks which the Court is not empowered to undertake.")

Moreover, the ALJ's error is prejudicial because Dr. Damania's opinion is inconsistent with the ALJ's ultimate finding of nondisability. *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 885 (9th Cir. 2006) ("[W]e have only found harmless error when it was clear from the record that an ALJ's error was inconsequential to the ultimate nondisability determination.") The ALJ concluded Plaintiff was not disabled because Plaintiff could perform certain jobs with a sedentary exertion level as identified by the VE. (AR 31.) The relevant definition of "sedentary work" requires an individual to sit for up to six hours a day. 20 C.F.R. § 404.1567(a); SSR 83-10 ("Since being on one's feet is required 'occasionally' at the sedentary level of exertion, periods of standing or walking should generally total no more than about 2 hours of an 8-hour workday, and sitting should generally total approximately 6 hours of an 8-hour workday."). However, Dr. Damania opined Plaintiff could only sit for two to four hours a day, which is substantially less than the six hours required for sedentary work. (AR 419.) Therefore, because Dr. Damania's opinion contradicts the ALJ's finding that Plaintiff could sit for six hours a day and perform sedentary work, the ALJ's error is prejudicial.

//

//

1       **4.      The ALJ Stated Sufficient Reasons for Rejecting NP Rico's Opinion.**

2           NP Rico was Plaintiff's primary care provider, in conjunction with Dr. Baron, beginning in

3   February 2014.  (AR 613–21.)  In September 2014, NP Completed a Disability Impairment

4   Questionnaire for Plaintiff, in which NP Rico diagnosed Plaintiff with neck pain, thoracic pain,

5   lumbar back pain, herniated discs (cervical and lumbar), and nerve root and plexus disorder.  (AR

6   499.)  The questionnaire, which appears to be signed by both NP Rico and Dr. Baron, stated

7   beginning as early as March 1, 2010, Plaintiff could perform a job in a seated position for only

8   one hour in an eight-hour workday, and a standing and/or walking position for only one hour in

9   an eight-hour day.  The questionnaire further stated Plaintiff could occasionally lift and carry up

10  to ten pounds, but could never left or carry any more than ten pounds, and on average, Plaintiff

11  would likely be absent more than three times a month due to his impairments.  (AR 501–02.)

12          In discounting NP Rico's opinion in the Disability Impairment Questionnaire, the ALJ

13  stated:

14              As a Nurse Practitioner, Ms. Rico is not an acceptable medical source and this
                opinion, standing alone, cannot constitute documentation of severe or disabling
15              vocational limitations. . . .  The claimant has no objective evidence of "herniated
                discs", rather there are small, mild bulges.  Ms. Rico's objective findings during
16              physical examination are not supportive of her opinion.

17

18  (AR 28.)[5]  As NP Rico's opinion is contradicted by the opinions of Dr. Damania and Drs. Jackson

19  and Mani, who concluded Plaintiff could walk and/or stand for four hours a day and frequently

20  _____

[5] The Court takes no position regarding the propriety of rejecting NP Rico's opinion because she is a nurse
21  practitioner.  The Ninth Circuit has held that a nurse practitioner may qualify as an "acceptable medical source" by
    working "closely under the supervision" of a doctor to the extent that she is "acting as an agent" of the doctor.
22  *Gomez v. Chater*, 74 F.3d 967, 971 (9th Cir. 1996); *but see Ka Ying Xiong v. Berryhill*, No. 1:17–cv–EPG, 2018
    WL 1621161, at *2 (E.D. Cal. Apr. 4, 2018) ("[A]s numerous district courts in the Ninth Circuit have recognized, . .
23  . the regulation relied on in *Gomez* regarding 'interdisciplinary teams' involving 'other sources' such as nurse
    practitioners and physician assistants has since been amended, and 'interdisciplinary teams' are no longer
    considered 'acceptable medical sources.') (quoting *Vega v. Colvin*, No. 14CV1485-LAB (DHB), 2015 WL
24  7769663, at *12–13 (S.D. Cal. Nov. 12, 2015) (citing cases))).  Here, the only support Plaintiff points to as evidence
    NP Rico was working "closely under the supervision" of Dr. Baron is over 100 pages of treatment notes from
25  doctors other than Dr. Baron (which appears to be a mistake as almost all these documents are not from NP Rico or
    Dr. Baron) and six treatment notes from Plaintiff's appointments with NP Rico.  (Doc. 17 at 20 (citing AR 409–503
26  and 658, 681, 693, 706, 776, 809.)  However, Dr. Baron's electronic signatures on the treatment notes cited by
    Plaintiff are weeks (AR 658, 706) and in one case well over a month (AR 693) after Plaintiff's treatment visits, and
27  the treatment notes from one appointment cited by Plaintiff are not even electronically signed by Dr. Baron (AR
    809).  Accordingly, while the Court reaches no conclusion as to whether NP Rico is an acceptable medical source,
28  based on the evidence identified by Plaintiff, it does not appear NP Rico worked closely under the supervision of
    Dr. Baron.  *Randrup v. Berryhill*, No. 1:16–cv–00436–SKO, 2017 WL 3334012, at *11 (E.D. Cal. Aug. 4, 2017)

lift and carry ten pounds, the ALJ was required to state "specific and legitimate" reasons, supported by substantial evidence, for rejecting NP Rico's opinion. *Trevizo*, 871 F.3d at 675 (citing *Ryan*, 528 F.3d at 1198); *see also Lester*, 81 F.3d at 830. The inconsistency between NP Rico's objective findings and her opinion, standing alone, is a sufficient specific and legitimate reason for discrediting NP Rico's opinion. *See Connett*, 340 F.3d at 875; *see also Tonapetyan*, 242 F.3d at 1149.

Here, the ALJ found that NP Rico's opinion was inconsistent with her objective findings during her physical examinations and cited a specific example that NP Rico opined Plaintiff suffered from "herniated discs," while the record only reflected "small, mild bulges." (AR 28.) Contrary to Plaintiff's contention, NP Rico did not specifically state on which MRIs her opinion was based when she opined that Plaintiff suffered from herniated discs. (Doc. 17 at 19 (citing AR 499).) Instead, NP Rico merely stated that Plaintiff had "multiple images done" as the support for her opinion. (AR 499.) While Plaintiff reaches a different conclusion from the ALJ by looking to MRIs from August 2015, the MRIs from December 2013 and September 2014 are consistent with the ALJ's decision. Specifically, as the ALJ pointed out, the December 2013 MRI of Plaintiff's cervical spine revealed degenerative changes in the cervical spine; *mild* reversal of the normal cervical lordosis at C4–C5; a two-millimeter left paracentral disc osteophyte complex at C4–C5, which *mildly* indented the left ventral surface of the spinal cord; a two-millimeter central protrusion with associated annular fissuring at the C5–C6 level, which caused a *mild* impression on the ventral surface of the spinal cord; and a one millimeter central protrusion with associated annular fissuring, which indented the thecal sac at the C6–C7 level. (AR 26 (citing AR 452–53).) These mild degenerative changes were unchanged on Plaintiff's MRI in September 2014. (AR 844.)

Further, as the ALJ pointed out, NP Rico herself explained to Plaintiff on March 4, 2014, just weeks before Plaintiff's date last insured of March 31, 2014, that his MRI findings were not severe enough to warrant surgery. (AR 26 (citing AR 642).) NP Rico strongly encouraged

(finding that a nurse practitioner was not an acceptable medical source where the only evidence of the relationship between the nurse practitioner and doctor was the doctor's electronic signatures on treatment notes weeks and months after the claimant's appointments).

Plaintiff to participate in physical therapy, but Plaintiff refused because he said he could not afford to travel to Oakhurst twice a week despite NP Rico reminding him of a service that would provide free transportation to his appointments. (AR 642.) Additionally, as the ALJ identified in his decision, NP Rico's physical examinations of Plaintiff regularly found him to be in no acute distress, able to change positions with ease, and have a steady gait and full range of motion in his joints, with weakness to upper extremity grips. (AR 26–27 (citing AR 617, 672–73).) The Court finds that these contradictions between NP Rico's opinion and treatment notes, identified by the ALJ, constitute "specific and legitimate" reasons for rejecting NP Rico's opinion and thus, the Court will not disturb the ALJ's decision. *See Tidwell*, 161 F.3d at 601.

**B.     The ALJ's Consideration of Plaintiff's Credibility**

**1.     Legal Standard**

In evaluating the credibility of a claimant's testimony regarding subjective pain, the ALJ must engage in a two-prong analysis. *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009). First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment that could reasonably be expected to produce the pain or other symptoms alleged. *Id.* The claimant is not required to show that his impairment "could reasonably be expected to cause the severity of the symptom [he] has alleged; [he] need only show that it could reasonably have caused some degree of the symptom." *Id.* (quoting *Lingenfelter*, 504 F.3d at 1035–36). Second, if the claimant meets the first test and there is no evidence of malingering, the ALJ can only reject the claimant's testimony about the severity of the symptoms if she gives "specific, clear and convincing reasons" for the rejection. *Id.*

As to the second prong, "[t]he clear and convincing standard is 'not an easy requirement to meet' and it 'is the most demanding standard required in Social Security cases.'" *Wells v. Comm'r of Soc. Sec.*, No. 1:17–cv–00078–SKO, 2017 WL 3620054, at *6 (E.D. Cal. Aug. 23, 2017) (quoting *Garrison v. Colvin*, 759 F.3d 995, 1015 (9th Cir. 2014)). "General findings are insufficient" to satisfy this standard. *Burrell v. Colvin*, 775 F.3d 1133, 1138 (9th Cir. 2014) (citation omitted). "[R]ather, the ALJ must identify what testimony is not credible and what

evidence undermines the claimant's complaints." *Id.*; *see, e.g.*, *Vasquez*, 572 F.3d at 592 ("To support a lack of credibility finding, the ALJ [is] required to 'point to specific facts in the record which demonstrate that [the claimant] is in less pain than [he] claims.'" (quoting *Dodrill v. Shalala*, 12 F.3d 915, 918 (9th Cir. 1993))); *cf. Burrell*, 775 F.3d at 1138 (stating that the Ninth Circuit's "decisions make clear that [courts] may not take a general finding . . . and comb the administrative record to find specific" support for the finding).

**2. The ALJ Properly Discounted Plaintiff's Subjective Complaints.**

The ALJ found Plaintiff's statements concerning the intensity, persistence, and limiting effects of his symptoms were not entirely credible for several reasons. Specifically, the ALJ found Plaintiff's testimony was undermined by 1) inconsistencies between his testimony and daily activities, 2) objective medical evidence in the record, and 3) his ability to effectively manage his symptoms using conservative treatment methods without hospitalization or surgery and work for several years after the accident that caused his back pain. (AR 29–30.)

**a. Activities of Daily Living**

The ALJ properly considered Plaintiff's activities of daily living in determining that Plaintiff was not entirely credible. When a claimant spends a substantial part of the day "engaged in pursuits involving the performance of physical functions that are transferrable to a work setting, a specific finding as to this fact may be sufficient to discredit a claimant's allegations." *Morgan*, 169 F.3d at 600 (quoting *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989)); *see also Molina*, 674 F.3d at 1112 ("While a claimant need not vegetate in a dark room in order to be eligible for benefits, the ALJ may discredit a claimant's testimony when the claimant reports participation in everyday activities indicating capacities that are transferable to a work setting.") (internal quotation and citations omitted). "Even where those activities suggest some difficulty functioning, they may be grounds for discrediting the claimant's testimony to the extent that they contradict claims of a totally debilitating impairment." *Molina*, 674 F.3d at 1112. (citations omitted).

At the hearing, Plaintiff testified that he has trouble with his fine motor skills and "can't control what [he is] doing with [his] fingers." (AR 60.) He testified his hands "feel like [he is]

wearing a pair of mitts" and his shoulders and arms feel like they are on fire. (AR 48.) According to Plaintiff, he has pain every day that feels like a knife is stuck in the middle of his back. (AR 52.) His pain fluctuates depending on what he is doing and gets worse when he is standing or engaging in any activities. (AR 52.) The ALJ, however, found that:

> The claimant testified that he reads books and magazines regularly and is capable of using the computer, tasks that are at odds with his limited hand use complaints (testimony). The claimant is able to run errands such as the post office or grocery store without assistance. He can walk 1–2 miles, stand 30–45 minutes and sit for 30–45 minutes. He drives and is able to do light housekeeping chores (Exhibit 4E).

(AR 30.) Plaintiff contends the ALJ erred by failing to elaborate on how these activities contradicted Plaintiff's testimony that his hand problems caused him to drop things, he could not raise his arms above his shoulders, and he was unable to use buttons. (Doc. 17 at 24.) However, the Court finds the ALJ sufficiently identified "*which* daily activities conflicted with *which* part of Claimant's testimony." *Burrell,* 775 F.3d at 1138 (emphasis in original). Specifically, the ALJ explained that, Plaintiff's claim that he had limited use of his hands, conflicted with his ability to regularly read books and magazines and use a computer. (AR 30.) Plaintiff's testimony is inconsistent with his activities of daily living because *if* Plaintiff could not control his fingers and felt like he was wearing mitts, as he testified (AR 48, 60), he would not be able to regularly pick up and read books and magazines or push the buttons on a keyboard when using a computer. Accordingly, the ALJ properly found that Plaintiff's testimony of debilitating fine motor skills conflicted with his daily activities.

Additionally, Plaintiff contends that the other activities identified by the ALJ (driving, going on errands, and performing light household chores) are "undemanding" and "sporadic" and do not demonstrate Plaintiff could perform sustained work on a full-time basis. (Doc. 17 at 24.) In support, Plaintiff cites only the Ninth Circuit opinion, *Orn v. Astrue*, 495 F.3d 625 (9th Cir. 2007), in which the ALJ rejected the claimant's testimony and concluded the claimant could perform a full-time job because he "sometimes reads, watches television, and colors in coloring books." *Id.* at 639. However, the Court held the ALJ erred because "watching television, and coloring in coloring books are activities that are so undemanding that they cannot be said to bear

a meaningful relationship to the activities of the workplace." *Id.* In contrast, here, the ALJ based his decision on Plaintiff's ability to drive his own car,[6] go on errands such as the grocery store and post office without assistance, and perform light household chores. (AR 30 (citing 192).) Driving, running errands independently, and performing light housework are plainly activities that bear more relation to activities in a workplace than occasional reading, watching TV, and coloring; thus, *Orn* provides no support for Plaintiff's position.

Given the nature of the activities of daily living identified by the ALJ, the Court finds that such activities tend to suggest that Plaintiff may still be able to perform, on a sustained basis, the basic demands of the sedentary, unskilled jobs identified by the VE. *See Fair*, 885 F.2d at 603 (finding that if a claimant has the ability to perform activities "that involved many of the same physical tasks as a particular type of job, it would not be farfetched for an ALJ to conclude that the claimant's pain does not prevent her from working"); *see also, e.g.*, *Stubbs-Danielson v. Astrue*, 539 F.3d 1169, 1175 (9th Cir. 2008) (finding that the ALJ sufficiently explained his reasons for discrediting the claimant's testimony because the record reflected that the claimant performed normal activities of daily living, including cooking, housecleaning, doing laundry, and helping her husband managing finances); *Nelson v. Colvin*, No. 1:15–cv–00696–SKO, 2016 WL 3407627, at *20 (E.D. Cal. June 20, 2016) (ALJ properly discredited subjective complaints of claimant who suffered from chronic back problems where claimant engaged in activities such as preparing simple meals, washing dishes, driving a car, shopping for groceries and household supplies two to three times a week, walking up to a mile, using a computer for about half an hour at a time, visiting with family, mopping and vacuuming, independently handling her own finances, and doing yoga tapes at home).

To be sure, the record also contains some contrary evidence, such as Plaintiff's statements regarding his daily pain and inability to wash dishes without breaking them. (AR 52, 56.) However, it is the function of the ALJ to resolve any ambiguities, and the Court finds the ALJ's assessment of Plaintiff's daily activities to be reasonable and supported by substantial evidence.

---

[6] Although Plaintiff testified at the hearing he was currently not driving based on his doctor's advice ahead of his neck surgery (AR 47, 57), Plaintiff's "Pain Questionnaire" completed on March 11, 2013, states that he drove his own car to go on errands (AR 192).

*See Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001) (affirming ALJ's credibility determination even where the claimant's testimony was somewhat equivocal about how regularly she was able to keep up with all of the activities and noting that the ALJ's interpretation "may not be the only reasonable one").

### b.  Objective Medical Evidence

The ALJ did not err in finding that the objective medical evidence fails to support Plaintiff's subjective complaints.  While subjective symptom testimony cannot be rejected solely on the ground that it is not fully corroborated by objective medical evidence, the medical evidence is still a relevant factor in determining Plaintiff's credibility.  *Rollins*, 261 F.3d at 857 (citing 20 C.F.R. § 404.1529(c)(2)); *Burch v. Barnhart*, 400 F.3d 676, 681 (9th Cir. 2005) ("[L]ack of medical evidence . . . is a factor that the ALJ can consider in his credibility analysis.").

Here, the ALJ discounted Plaintiff's credibility, in part, because Plaintiff's allegations of severe symptoms were not supported by the clinical evidence.  Specifically, the ALJ noted

> Although thoracic spinal stenosis and cord impingement were initially reported post-2005 in MRI scans, repeat scans since that time do not contain such findings (see, Exhibit 17F).  Records of Dr. Smith notes that MRIs of the back were normal and two recent scans disclosed nothing in the neck (Exhibit 1F).  His gait was normal (Exhibit 3F).  His range of motion and neurological testing were normal and imaging tests of the thoracic spine were mildly abnormal and [sic] (Exhibit 5F).  Cervical and thoracic MRIs were mildly abnormal (Exhibits 6F and 7F).  Dr. Joshi's records contain a normal EMG and nerve conduction studies (Exhibit 8F).  More mild spinal changes were noted in imaging studies (Exhibit 9F).

(AR 30.)  Plaintiff contends that the ALJ mischaracterized the medical evidence and refers to other medical evidence that allegedly conflicts with the evidence cited by the ALJ.  (Doc. 17 at 26–27.)  For example, in response to the ALJ's finding that the MRI of Plaintiff's thoracic spine only revealed mildly abnormal results, Plaintiff contends that the positive findings of his cervical and lumbar spine were more severe.  (Doc. 17 at 26–27.)  Similarly, Plaintiff disputes the ALJ's citation to PA Armitage's treatment notes observing Plaintiff's gait to be normal (AR 30 (citing AR 400–01)) by citing to Dr. Smith's treatment notes finding Plaintiff to have an antalgic gait.  (Doc. 17 at 27 (citing AR 241).)  However, "[e]ven assuming without deciding that the medical evidence could support conflicting inferences, the court must defer to the Commissioner where

the evidence is susceptible to more than one rational interpretation." *Quinones v. Astrue*, No. CV 08-7225 AGR, 2009 WL 3122880, at *3 (C.D. Cal. Sept. 25, 2009) (citing *Moncada v. Chater*, 60 F.3d 521, 523 (9th Cir. 1995)); *see also Andrews*, 53 F.3d at 1039 ("The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities."). Accordingly, although Plaintiff identifies other evidence in the record that may support a different conclusion, the ALJ's findings were supported by specific citations to substantial evidence in the record and this court will not second-guess the ALJ's conclusions. *Davis v. Berryhill*, --- Fed. Appx ---, 2018 WL 2772214, at *2 (9th Cir. 2018) ("Though Davis may disagree with the ALJ's interpretation of the record, the latter's interpretation is supported by substantial evidence, which precludes the Court from engaging in second-guessing.").

Plaintiff further contends that the ALJ's description of the cervical spine MRIs as "mildly abnormal" is a lay opinion, which constitutes insubstantial evidence. (Doc. 17 at 27.) However, the cervical spine MRIs cited by the ALJ from November 2013 repeatedly refer to mild abnormalities identified by the medical doctor reviewing the images. (AR 30 (citing AR 449 ("*mild* degenerative changes of the cervical spine" (emphasis added)), 460 (same), 453 (noting a two-millimeter protrusion that "causes a *mild* impression on the ventral surface of the spinal cord" (emphasis added)). Thus, there is substantial evidence in the record to support the ALJ's finding and the ALJ did not err by characterizing Plaintiff's cervical spine MRIs as "mildly abnormal." *See Fair*, 885 F.2d at 604 ("Where . . . the ALJ has made specific findings justifying a decision to disbelieve an allegation of excess pain, and those findings are supported by substantial evidence in the record, our role is not to second-guess that decision.").

Plaintiff also disputes the ALJ's characterization of Dr. Smith's treatment notes as stating the MRI of Plaintiff's back was normal. (Doc. 17 at 27.) Indeed, although Dr. Smith found Plaintiff's thoracic spine to be normal, Dr. Smith found Plaintiff's lumbar spine to show "a new disc rupture at L4–5 with right L5 and S1 nerve root compression." (AR 242.) As such, because Dr. Smith's treatment notes identify lumbar spine abnormalities, the notes do not show Plaintiff's back was normal as the ALJ stated and the ALJ erred by ignoring this portion of Dr. Smith's treatment notes. *See Garrison*, 759 F.3d at 1013 ("[A]n ALJ errs when he rejects a medical

opinion . . . while doing nothing more than ignoring it."); *Phillips v. Sullivan*, No. CV. F-88-220-REC, 1989 WL 280270, at *3 (E.D. Cal. June 27, 1989) ("If certain evidence in the record supports a plaintiff's claim, the ALJ may not simply ignore it.").  However, even though the ALJ erred by ignoring a portion of Dr. Smith's treatment notes, such error is harmless because the ALJ specified ample other objective evidence in the record that contradicted Plaintiff's subjective complaints. (AR 30 (citing AR 400–01 (treatment notes of PA Armitage observing normal gait), 449 (mildly abnormal MRI findings), 453 (same), 460 (same), 462–72 (treatment notes of Dr. Joshi including normal motor and sensory nerve studies)).  Moreover, the inconsistency between Plaintiff's testimony and activities of daily living as well as his effective conservative treatment record provide independent clear and convincing evidence to discredit Plaintiff's testimony.  *See Carmickle v. Comm'r, Soc. Sec. Admin.*, 533 F.3d 1155, 1162 (9th Cir. 2008); *Wells*, 2017 WL 3620054, at *10 ("While the ALJ erred in providing one invalid reason for the credibility finding . . . that error was harmless, as substantial evidence still supports the ALJ's credibility determination notwithstanding the single errant rationale.").

### c. Conservative Medical Treatment

The ALJ's credibility assessment properly relied on evidence showing improvement in Plaintiff's symptoms with conservative medical treatment.  However, the ALJ erroneously relied on Plaintiff's work history prior to his alleged onset date and the fact that Plaintiff did not undergo surgery or hospitalization while managing his conditions with conservative treatment methods. (AR 30.)  The ALJ found:

> This 43-year old man alleges chronic severe neck and back pain following an old October 2003 work-related spinal injury that resulted in a diagnosis of lumbar, cervical and thoracic degenerative disease.  However, he was able to work successfully for a number of years after this accident, has never undergone surgery or hospitalization and has been managed conservatively with scant evidence of medical treatment during the last several years.

(AR 30.)  In other words, the ALJ found Plaintiff's testimony less credible because 1) he worked successfully for several years after the accident that caused his back pain, 2) he never underwent surgery or hospitalization, and 3) he has managed his pain successfully with conservative treatment.

While the ALJ found Plaintiff less credible because he worked successfully for several years after the accident that caused his back pain (AR 30), the Court notes Plaintiff only worked successfully prior to his alleged onset date of June 1, 2011, when he worked as a museum host from 2006 to 2008 and a bus driver from 2009 to 2010. (AR 177.) Plaintiff also worked as a limo driver from March to June 2011, but stopped because it exacerbated his back pain. (AR 177, 304.) Although Plaintiff's opening brief does not specifically respond to the ALJ's finding related to how Plaintiff's work history affects his credibility, such work history prior to Plaintiff's alleged onset date is "of limited relevance" and the ALJ erred to the extent he relied on it in discrediting Plaintiff's credibility. *Delegans v. Colvin*, 584 Fed. Appx 328, 330 (9th Cir. 2014) (statements about work history were "of limited relevance" because they involved time periods predating alleged onset date); *Archer v. Apfel*, 66 Fed. Appx 121, 122 (9th Cir. 2003) ("[T]he ALJ erred by considering Archer's good work history before the alleged onset date as evidence for discrediting his testimony."); *see also Boissiere v. Berryhill*, 2017 WL 3741261, at *7 (C.D. Cal. Aug. 30, 2017) (ALJ erred by failing to explain how claimant's "sporadic" employment prior to the alleged onset date in 2008 impacted her testimony in 2014 regarding her impairments).

However, to the extent the ALJ erred, the error was harmless because the inconsistency between Plaintiff's testimony and activities of daily living as well as his effective conservative treatment record are independent, sufficient reasons to discredit Plaintiff's testimony. Thus, the ALJ met his burden to identify several clear and convincing reasons supporting his adverse credibility determination, which were "sufficiently specific to allow a reviewing court to conclude the ALJ rejected the claimant's testimony on permissible grounds." *Moisa v. Barnhart*, 367 F.3d 882, 885 (9th Cir. 2004); *see also Thomas v. Barnhart*, 278 F.3d 947, 958 (9th Cir. 2002). As such, the reliance upon one invalid reason is harmless, because the error "does not negate the validity of the ALJ's ultimate credibility conclusion." *Carmickle*, 533 F.3d at 1160 (quoting *Batson v. Comm'r of Soc. Sec. Admin*, 359 F.3d 1190, 1197 (9th Cir. 2004).

Additionally, even though the ALJ found Plaintiff less credible because he never underwent surgery or hospitalization (AR 30), as Plaintiff points out, his failure to undergo surgery was due to his lack of medical insurance and inability to afford surgery. (Doc. 17 at 25.) In the Ninth

Circuit, a claimant's inability to pay for treatment cannot support an adverse credibility finding. *Trevizo*, 871 F.3d at 681 ("Disability benefits may not be denied because of the claimant's failure to obtain treatment he cannot obtain for lack of funds." (quoting *Gamble v. Chater*, 68 F.3d 319, 321 (9th Cir. 1995)); *Ondracek v. Comm'r of Soc. Sec.*, No. 1:15–cv–01308–SKO, 2017 WL 714374, at *8 (E.D. Cal. Feb. 22, 2017) ("[A] claimant's 'failure to receive medical treatment during the period that he had no medical insurance cannot support an adverse credibility finding.'" (quoting *Orn*, 495 F.3d at 638)).

While the record contains evidence that Plaintiff did not pursue more invasive treatment for reasons other than his lack of insurance, the ALJ did not identify these reasons and ample evidence exists in the record demonstrating Plaintiff's inability to afford other treatments and medications. (*See e.g.*, AR 53 (testifying he did not undergo surgery on his back because "it seemed like a pretty evasive [sic] surgery for the problem at the time"), 249 (stating he planned to cut back on his medications because he could not afford them), 257 (complaining he could not afford a "massive bill" from Dr. Smith).) Moreover, Plaintiff's decision to forgo surgery was well before his alleged onset date of June 1, 2011, making this evidence of limited relevance compared to the more recent and prevalent evidence of Plaintiff's difficult financial circumstances. Accordingly, the ALJ erred by questioning Plaintiff's credibility where Plaintiff did not seek medical treatment because of his lack of insurance. However, the error was harmless because Plaintiff's activities of daily living and the success of the treatment methods Plaintiff actually did use establish adequate alternative reasons for discrediting Plaintiff's testimony. *Carmickle*, 533 F.3d at 1162.

Finally, although the ALJ may not make a negative inference about Plaintiff's conservative treatment when Plaintiff cannot afford medical care, the record shows Plaintiff's conservative treatment was generally effective in managing Plaintiff's pain. An ALJ may properly rely on such effective conservative treatment to discredit a claimant's testimony. *Tommasetti v. Astrue*, 533 F.3d 1035, 1040 (9th Cir. 2008) (favorable response to conservative treatment undermined claimant's testimony of subjective complaints); *Giordano v. Astrue*, 304 Fed. Appx 507, 509 (9th Cir. 2008) ("It was reasonable for the ALJ to conclude that Giordano's testimony overstated her actual limitations, based on Giordano's . . . effective pain management with relatively conservative

treatment."); *see also Warre v. Comm'r of Soc. Sec. Admin.*, 439 F.3d 1001, 1006 (9th Cir. 2006) ("Impairments that can be controlled effectively with medication are not disabling."); *Randolph v. Comm'r of Soc. Sec.*, No. 2:16–cv–01188–CKD, 2017 WL 4038386, at *5 (E.D. Cal. Sept. 13, 2017) ("All of this reportedly effective treatment was fairly conservative in nature, and serves as a valid basis to discount plaintiff's credibility.").

Here, the record demonstrates Plaintiff's conservative treatment effectively managed his pain. Plaintiff testified at the hearing that medication helped alleviate his pain and the TENS unit helped reduce his inflammation. (AR 49–50.) The epidural injections in his neck, however, were not effective. (AR 49–50.) The ALJ noted Plaintiff reported to Dr. Stacey that his pain was "fairly well controlled" on medication and his medication "worked really well for his neck pain." (AR 27–28 (citing AR 304, 307).) The record also includes other instances where Plaintiff reported successful results from his conservative treatment. (AR 274 (medications were "really, really helping" and he was doing "much, much better"), 304 ("neck pain is almost completely resolved" from medication), 372 ("His medications give him relief from pain.").) Accordingly, the ALJ did not err by finding that Plaintiff's effective conservative treatment undermined his testimony of subjective complaints.

Plaintiff disputes the ALJ's characterization of Plaintiff's treatment as "conservative" when he underwent a number of different treatments including physical therapy, injections, use of a TENS unit, and opioid medications. (Doc. 17 at 25.) However, Plaintiff fails to cite any authority to support his position that such treatment was not conservative. To the contrary, several courts in this circuit have found that similar measures constitute conservative treatment. *See, e.g., Traynor v. Colvin*, No. 1:13–cv–1041–BAM, 2014 WL 4792593, at *9 (E.D. Cal. Sept. 24, 2014) (finding evidence that Plaintiff's symptoms were managed through "prescription medications and infrequent epidural and cortisone injections" was "conservative treatment" and was sufficient for the ALJ to discount the plaintiff's testimony regarding the severity of impairment.); *Morris v. Colvin*, No. 13–6236, 2014 WL 2547599, at *4 (C.D. Cal. June 3, 2014) (ALJ properly discounted credibility when plaintiff received conservative treatment consisting of physical therapy, use of TENS unit, chiropractic treatment, Vicodin, and Tylenol with Vicodin*)*; *Jones v. Comm'r of Soc.*

*Sec.*, No. 2:12–cv–01714–KJN, 2014 WL 228590, at *7–10 (E.D. Cal. Jan. 21, 2014) (ALJ properly found that plaintiff's conservative treatment, which included physical therapy, anti-inflammatory and narcotic medications, use of a TENS unit, occasional epidural steroid injections, and massage therapy, diminished plaintiff's credibility). Thus, the ALJ did not err by characterizing Plaintiff's treatment as conservative.

**C.    Remand is Required**

Although the ALJ stated sufficient reasons for rejecting the opinions of Dr. Stacey and NP Rico and properly discredited Plaintiff's testimony, the ALJ did not provide sufficient reasons for discounting the opinion of Dr. Damania regarding Plaintiff's ability to sit for only two to four hours in an eight-hour day. Generally, "[w]here the Commissioner fails to provide adequate reasons for rejecting the opinion of a treating or examining physician, [the Court credits] that opinion as 'a matter of law.'" *Lester*, 81 F.3d at 830–34 (finding that, if doctors' opinions and plaintiff's testimony were credited as true, plaintiff's condition met a listing (quoting *Hammock v. Bowen*, 879 F.2d 498, 502 (9th Cir. 1989))). Crediting an opinion as a matter of law is appropriate when, taking that opinion as true, the evidence supports a finding of disability. *See Smolen*, 80 F.3d at 1292.

Courts retain flexibility, however, in applying this crediting-as-true theory. *Connett*, 340 F.3d at 876 (remanding for further determinations where there were insufficient findings as to whether plaintiff's testimony should be credited as true). "In some cases, automatic reversal would bestow a benefits windfall upon an undeserving, able claimant." *Barbato v. Comm'r of Soc. Sec. Admin.*, 923 F.Supp. 1273, 1278 (C.D. Cal. 1996) (remanding for further proceedings where the ALJ erred by failing to provide legally sufficient reasons for rejecting a physician's opinion). "[T]he required analysis centers on what the record evidence shows about the existence or non-existence of a disability" and a claimant is not entitled to disability benefits "unless the claimant is, in fact, disabled, no matter how egregious the ALJ's errors may be." *Strauss v. Comm'r of the Soc. Sec. Admin.*, 635 F.3d 1135, 1138 (9th Cir. 2011).

Here, the ALJ erred because he failed to provide a legally sufficient reason for partially rejecting Dr. Damania's opinion, which creates doubt as to whether Plaintiff is, in fact, disabled.

The ALJ accorded "great weight" to Dr. Damania's opinion, but the ALJ adopted an RFC that did not reflect all the limitations imposed by Dr. Damania. Although the ALJ's RFC assessment is more consistent with the opinions of Drs. Mani and Jackson, the ALJ failed to provide specific and legitimate reasons for crediting Drs. Mani and Jackson over Dr. Damania. Thus, there are "outstanding issues to be resolved before the determination of disability can be made." *Pulido v. Comm'r of Soc. Sec.*, No. 1:16–cv–01155–SAB, 2017 WL 3588026, at *6 (E.D. Cal. Aug. 21, 2017) (citing *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1106 (9th Cir. 2014)). Although remand necessitates delay, "the cost of this delay should be balanced against the risk of an erroneous determination" and a reviewing court should have discretion to avoid "bestow[ing] a benefits windfall upon an undeserving, able claimant" by remanding the case for further administrative proceedings. *Barbato*, 923 F.Supp. at 1278; *see also McAllister v. Sullivan*, 888 F.2d 599, 603 (9th Cir. 1989) (remanding for further proceedings because Secretary of Health and Human Services was in better position than court to point to evidence in record to provide specific, legitimate reasons to disregard treating physician's opinion).

Accordingly, the Court exercises its discretion to remand this case to the Commissioner for further proceedings. *See McAllister*, 888 F.2d at 603 (holding that court may remand to allow ALJ to provide the requisite specific and legitimate reasons for disregarding medical opinions); *Burrell*, 775 F.3d at 1141 ("We may remand on an open record for further proceedings 'when the record as a whole creates serious doubt as to whether the claimant is, in fact, disabled within the meaning of the Social Security Act.'" (quoting *Garrison*, 759 F.3d at 1021)). On remand, the ALJ shall consider the medical evidence as a whole, and either properly credit Dr. Damania's opinion, or provide specific and legitimate reasons, supported by substantial evidence, for rejecting Dr. Damania's opinion. The ALJ shall then assess Plaintiff's RFC and proceed through Steps Four and Five to determine what work, if any, Plaintiff is capable of performing.

## VI. CONCLUSION AND ORDER

Based on the foregoing, the Court finds that the ALJ's decision is not supported by substantial evidence and is, therefore, REVERSED and the case REMANDED to the ALJ for further proceedings consistent with this order. The Clerk of this Court is DIRECTED to enter

judgment in favor of Plaintiff Fred D. McMillen and against Defendant Nancy A. Berryhill, Acting Commissioner of Social Security.

IT IS SO ORDERED.

Dated:   **August 7, 2018**                       /s/ *Sheila K. Oberto*

                                        UNITED STATES MAGISTRATE JUDGE